# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

HCC INSURANCE HOLDINGS, INC.,

        **Plaintiff,**

    **v.**

VALDA FLOWERS, CREATIVE RISK UNDERWRITERS, LLC, MICHAEL REMEIKA,

        **Defendant.**

1:15-cv-3262-WSD

## OPINION AND ORDER

This matter is before the Court on Defendants Valda Flowers ("Flowers"),

Creative Risk Underwriters, LLC ("CRU"), and Michael Remeika's ("Remeika")

(collectively, "Defendants") Motion for Summary Judgment [87].

## I.  BACKGROUND[1]

This case arises out of Flowers' and Remeika's resignation from non-party

HCC Life Insurance Company ("HCC Life") and their operation of a competing

---

[1]  Because the issues and evidence presented in Plaintiff HCC Holdings, Inc.'s ("HCC") Motion for Sanctions for Spoliation [85] are relevant to the matters the Court must consider with respect to Defendants' Motion for Summary Judgment, the Court here relies, in part, on the statement of facts set forth in the Court's Order [121] on HCC's sanctions motion.

business, CRU.  On September 16, 2015, HCC Insurance Holdings, Inc. ("HCC")

initiated this action, claiming that Flowers, at the direction of Remeika,

misappropriated HCC's trade secrets to establish CRU and compete with HCC.

HCC claims Flowers engaged in a variety activities that indicate that she

misappropriated HCC's trade secrets.

      A.    <u>Flowers' Activity</u>

          1.    <u>Email Activity</u>

On August 11, 2015, 8,683 emails from Flowers' HCC Life email account

were moved to her H: Drive on HCC's network.  1,384 of those emails were then

deleted.  HCC claims this activity was suspicious, including because Flowers had

never moved emails to her H: Drive before, her email box was not close to

capacity, and she deleted emails from this email box on the same day.  HCC's

former employee, Shalla Miguez, testified that she helped Flowers move the emails

after Flowers asked her to help clean up her inbox, and she asked to be shown how

to create folders to save relevant emails.

          2.    <u>Hot Sheet Activity</u>

On August 12, 2015, Flowers copied to her H: Drive on HCC's network

around 500 "Hot Sheets" from HCC Life's underwriting drive.  She then

transferred them to the local C: Drive of her HCC computer.  Hot Sheets are excel

spreadsheets that list prospective new business and existing policies up for renewal.  HCC claims Flowers' activity was suspicious because it was not part of her job duties to update all of HCC's Hot Sheets, and because, prior to August 12, 2015, Flowers only had four Hot Sheet folders located in the C: Drive of her HCC computer.  Defendants claim that updating Hot Sheets was part of Flowers' regular job duties, and note that, on the same day the Hot Sheets were moved, Flowers received an email requesting that all Hot Sheets be updated. Defendants also note that Flowers' history of working with Hot Sheets shows she often copied them to her local HCC computer.

On August 20, 2015, the night before she resigned, Flowers deleted over 500 Hot Sheets from the C: Drive of her HCC computer.  HCC claims this activity is suspicious because a forensic review of Flowers' past practices showed no evidence of any other mass deletions of documents.  Defendants note that all of the "deleted" Hot Sheets were in the recycle bin of Flowers' HCC laptop, and that HCC had the ability to retrieve the files.

### 3.   Return of HCC Computer

On Friday, August 21, 2015, Flowers emailed her resignation letter to her supervisor at HCC Life.  That afternoon, HCC Life's Human Resources Manager, Tim Swoger, called Flowers three times to request that she return her HCC

3

computer.  Flowers returned her computer around 4:15 p.m. that day, after asking

Mr. Swoger whether she could keep her HCC computer over the weekend.  HCC

claims this activity was suspicious, including because Flowers logged into HCC

Life's networks remotely after 10 p.m. the night before she resigned, and again

throughout the day of her resignation.  HCC contends that Flowers was attempting

to access the HCC network to complete her expense report, because she had

$41,272.00 in reimbursable expenses and had not submitted an expense report

since June 2015.

B.    CRU

A few weeks before they both resigned, Flowers told Remeika "she was

thinking of becoming an Uber driver" and she "express[ed] that she was unhappy"

with her employment at HCC.  (Remeika Dep. [93.3] at 30:13-18).  During that

same conversation, Remeika told Flowers he was thinking of starting his own

company, and Flowers said she would like to join him if he did.  (Id. at 30:19-

31:24).  Though Remeika also stated that the two of them "talked about being

partners[,]" (Id. at 32:19), the context of Remeika's testimony is clear that Flowers

initiated the idea of joining Remeika.  Flowers testified that she told Remeika she

was dissatisfied with her job at HCC.  (Flowers Dep. [87.7] at 36:6-37:23).  She

told him that she "wanted to drive for Uber or somebody like that.  I was ready to

4

quit." (Id. at 38:6-7). Remeika "told [her] he was thinking about doing something else and would I want to be a partner. We were thinking about being partners. But we had—I had talked about leaving [HCC Life] for—on and off for a couple of years." (Id. at 38:11-16). Flowers testified that, prior to the conversation, she had sent out résumés, and had a résumé posted on Career Builder for "forever." (Id. at 38:19-23). On August 3, 2015, a few weeks before the two resigned, Remeika and Flowers set up CRU. The two researched the viability of starting CRU "on [their] own time." (Remeika Decl. [87.4] ¶ 2). Their activities included creating a business plan, discussing potential vendors, estimating operating expenses, answering questionnaires needed to obtain approval from carriers to use their paper for CRU, creating a list of CRU's needs, and setting up a domain name. (See [93.2] ¶¶ 32-39). On August 21, 2016, Flowers and Remeika resigned.[2]

CRU competes with HCC. A July 2015 CRU strategy document states that CRU's strategy was to "cherry-pick" accounts from HCC. HCC claims that CRU (1) was formed from the ground up in approximately two months, and "stole" its first account from HCC one month after Remeika and Flowers resigned; and (2) HCC subsequently stole seventeen (17) former HCC Life accounts within the

---

[2]     On August 25, 2015, Remeika declined HCC Life's request that he reconsider his resignation. (Remeika Dep. 32:22-33:2).

first five months of CRU's existence.  HCC contends that it is "inconceivable, in an industry with high barriers to entry, that a small, start-up company could have had such immediate success without using HCC's trade secrets."  ([93] at 9).

C.   Mr. Flowers

Flowers' husband, Jeff Flowers, is an experienced IT professional with 35 years of experience, and he assisted CRU with IT matters.  HCC claims Mr. Flowers helped Flowers misappropriate HCC trade secrets.  HCC claims Mr. Flowers "could have utilized several methods to transfer HCC's trade secrets to [Flowers'] personal devices without leaving any evidence on her HCC computer," including by using Gmail, using Citrix, or by imaging the hard drive of Flowers' HCC computer.

D.   Allegedly Destroyed Evidence

HCC claims that, after receiving the lawsuit papers in this case, and after the Court ordered Flowers to produce her personal computer, Defendants destroyed:  (1) data on Flowers' personal laptop; and (2) a thumb drive that was plugged into Flowers' personal computer on September 20, 2015 ("Thumb Drive").

6

1.   Thumb Drive

Mr. Flowers claims he inserted his personal Thumb Drive on
September 20, 2015 to back up data on Flowers' personal laptop, that the Thumb
Drive was corrupted and did not work, and that he therefore threw it away.
Mr. Flowers tried to plug the Thumb Drive into the laptop twice, but the computer
did not appear to recognize the Thumb Drive since he did not see an auto-popup or
auto-play message.  Mr. Flowers believed the Thumb Drive was defective, and he
discarded the Thumb Drive the same day by throwing it into the trash.  HCC
contends Mr. Flowers' claim is contradicted by Defendants' own computer
forensic expert, who confirmed that, the second time Mr. Flowers inserted the
thumb drive, it worked properly.  The second time Mr. Flowers plugged it in, he
removed it after 38 seconds.  Two days later, on September 22, 2015, Mr. Flowers
used a different thumb drive to copy iTunes and photograph folders that he claims
he intended to copy on September 20, 2015.

2.   Personal Computer

On September 19, 2015, and again on September 22, 2015, the day after the
Court ordered Flowers to produce her personal computer, the computer wiping
program CCleaner was manually run on Flowers' personal laptop.  CCleaner is a
program that can be used to clean the registry of a computer, which becomes

corrupted during updates to the computer.  The parties disagree how often the CCleaner program was run manually, with Defendants contending it had been run manually at least fifteen (15) times, and HCC claiming the program had only been run manually once before in September 2013.  HCC also claims the program was run a total of eleven times from September 19 through September 22, whereas it had previously only been run a total of four times.  During the time period of September 19 through September 22, 2015, the laptop had a "blue screen" crash, and there was an update to Windows and/or the iTunes program.  Mr. Flowers claims he ran the CCleaner registry cleaning function to get the laptop to properly run.  Defendants claim the laptop is an unstable machine that frequently crashes, and was originally purchased in 2008.  Because of its unreliability, Defendants claim they use it mostly to store Flowers' iTunes account and photograph folders.

HCC claims that, on September 22, 2015, a program called Defraggler was run on the laptop.  Defraggler is a program that overwrites deleted files in unallocated space on a computer's hard drive.  Mr. Flowers used Defraggler routinely on the laptop for maintenance, and Defendants contend that the last time Defraggler was used on the laptop was on June 9, 2015, months before the events relevant to this action.

On September 24, 2015, the day before Flowers turned her personal computer over to Greg Freemyer, the neutral forensic examiner jointly selected by the parties ("Neutral"), a program called WinUndelete, which is used to recover deleted files, was run on her personal computer.  HCC claims Mr. Flowers used WinUndelete to confirm that he had destroyed evidence.  Mr. Flowers claims he ran the program off of his work thumb drive to familiarize himself with it for future use for work purposes.

E.     Discovery and Forensic Examinations

During discovery, Flowers turned over all of her personal and work computers, electronic storage devices, email accounts and cloud storage accounts to the Neutral.  After running extensive searches over several weeks, the Neutral did not locate any HCC confidential information or trade secrets.  The parties then sent all of the data collected by the Neutral to each party's respective forensic expert.  HCC's forensic expert, Davis Roose, did not identify any document, information, files, or other data taken from HCC by Flowers.

HCC subpoenaed Google, Microsoft, and Citrix to produce emails and documents from Flowers', Remeika's, and Mr. Flowers' accounts from May 2015 through November 2015, and deposed several witnesses, including Mr. Flowers and his son.  HCC has not presented any evidence that HCC's Hot Sheets or other

sensitive information were resident on any electronic device or storage medium in Flowers' custody, possession, or control.  It claims that Defendants "were able to effectively cover their tracks to make it impossible to determine exactly what HCC information they misappropriated."  ([93] at 1-2).

F.    Business Confidentiality Policy

HCC claims Flowers breached its Business Confidentiality Policy ("Policy").  The Policy defines "Confidential Information" to include "all information relating to [HCC] or its operations which is not generally known to people that are not employees of, or otherwise associated with, [HCC] whether or not designated as confidential."  ([93.5] at 20).  The Policy does not include a time limitation.

G.    Procedural History

On September 16, 2015, HCC filed its Complaint.  On June 30, 2016, HCC filed its Revised Second Amended Complaint [83] ("RSAC").  In it, HCC asserts the following claims:  (1) misappropriation and theft of trade secrets, in violation of the Georgia Trade Secrets Act, O.C.G.A. § 10-1-760, et seq. ("GTSA"); (2) breach of contract; (3) tortious interference with contract; (4) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, et seq. ("CFAA"); (5) breach of fiduciary duty; and (6) attorneys' fees under O.C.G.A. § 13-6-11.

On July 29, 2016, HCC filed its Motion for Sanctions for Spoliation, seeking an adverse inference against Defendants for their alleged destruction of electronic evidence.  On July 29, 2016, Defendants filed their Motion for Summary Judgment.

On January 30, 2017, the Court issued an order [121] denying HCC's Motion for Sanctions for Spoliation.  The Court found that "HCC's Motion is based on a series of events it casts as suspicious, but HCC offers only bare speculation that any of its trade secrets or other data were actually transferred from HCC Life's systems to Flowers' personal laptop."  ([121] at 12).

## II.   DISCUSSION

### A.   Legal Standard

Summary judgment is appropriate where the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56.  The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the moving party has met this burden, the nonmoving party must demonstrate that summary judgment is inappropriate by designating specific facts showing a

genuine issue for trial.  Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282

(11th Cir. 1999).  The nonmoving party "need not present evidence in a form

necessary for admission at trial; however, he may not merely rest on his

pleadings."  Id.

     "At the summary judgment stage, facts must be viewed in the light most

favorable to the nonmoving party only if there is a 'genuine' dispute as to those

facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  Where the record tells two

different stories, one blatantly contradicted by the evidence, the Court is not

required to adopt that version of the facts when ruling on summary judgment.  Id.

"[C]redibility determinations, the weighing of evidence, and the drawing of

inferences from the facts are the function of the jury . . . ."  Graham, 193 F.3d at

1282.  "If the record presents factual issues, the court must not decide them; it must

deny the motion and proceed to trial."  Herzog, 193 F.3d at 1246.  The party

opposing summary judgment "'must do more than simply show that there is some

metaphysical doubt as to the material facts . . . .  Where the record taken as a whole

could not lead a rational trier of fact to find for the nonmoving party, there is no

genuine issue for trial.'"  Scott, 550 U.S. at 380 (quoting Matsushita Elec. Indus.

Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).  A party is entitled

to summary judgment if "the facts and inferences point overwhelmingly in favor of

the moving party, such that reasonable people could not arrive at a contrary verdict."  Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (quotations omitted).

      B.     Analysis

          1.     GTSA Claim

HCC claims Defendants misappropriated trade secrets, in violation of the GTSA.  The GTSA "provides that a plaintiff may recover damages for the misappropriation of trade secrets upon proof that (1) it possessed a trade secret, and (2) the opposing party misappropriated it[.]"  Diamond Power Intern., Inc. v. Davidson, 540 F. Supp. 2d 1322, 1332 (N.D. Ga. 2007) (citing O.C.G.A. § 10-1-763; Capital Asset Research Corp. v. Finnegan, 160 F.3d 683, 685 (11th Cir.1998); Camp Creek Hosp. Inns, Inc. v. Sheraton Franchise Corp., 139 F.3d 1396, 1410 (11th Cir.1998)); see also Hilb, Rogal & Hamilton Co. of Atlanta, Inc. v. Holley, 644 S.E.2d 862, 867 (Ga. Ct. App. 2007).

          a)     Whether the Hot Sheets are Trade Secrets

Defendants argue that HCC fails to present evidence to show that the Hot Sheets qualify as trade secrets under the GTSA.  Whether information deserves protection as a trade secret is a question of fact.  Diamond Power Int'l, Inc. v. Davidson, 540 F. Supp. 2d 1322, 1332 (N.D. Ga. 2007) (citing Insight Tech.,

Inc. v. FreightCheck, LLC, 633 S.E.2d 373, 380 (Ga. Ct. App. 2006)).  To prove the existence of a trade secret, the plaintiff must show that it possessed information—which may include technical or nontechnical data, financial plans, customer lists, a product design, or product plans—that derives economic value from not being generally known or readily ascertainable to others, and that "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  O.C.G.A. § 10-1-761(4).

HCC represents that the trade secrets it claims were misappropriated were "the more than 500 Hot Sheets Flowers suspiciously copied on August 12, 2015." ([93] at 11).  Defendants argue, among other things, that the Hot Sheets are not trade secrets because HCC did not take reasonable efforts to maintain their secrecy. To support their argument, Defendants present the following evidence:  HCC did not mark the Hot Sheets as confidential; HCC does not require its employees in the underwriting or marketing departments to sign a non-disclosure agreement; HCC does not prohibit the deletion of Hot Sheets; HCC does not prohibit moving Hot Sheets between various drives on HCC's computers; HCC's underwriters have printed out Hot Sheets, and they were authorized to access the Hot Sheets remotely on their personal computers; HCC does not require its producers to sign non-disclosure agreements regarding the confidentiality of HCC information provided

14

to them; HCC's security policies do not specifically reference the Hot Sheets or create protocols for their security; even though HCC's data classification system had the ability to track whether an employee copied files like Hot Sheets, HCC did not have that function turned on.  HCC argues that its Business Confidentiality Policy and Enterprise Information Security Acceptable Use Policy prohibit unauthorized access, use, and disclosure of confidential information.[3]  It also notes that it protects its trade secrets through computer security measures and limiting access to servers and trade secret documents to certain designated employees.

The facts here are similar to those in Diamond Power.  In Diamond Power, the Court considered whether the plaintiff took reasonable efforts to maintain the secrecy of an electronic document (the "Hardware Book") that contained a list of parts and raw materials used in its equipment.  The Court summarized the facts as follows:

> Defendants contend that the Hardware Book file is not a trade secret under the GTSA because Diamond Power failed to take reasonable efforts to maintain its secrecy.  Unlike [other files . . .] which were secured on Diamond Power's Oracle network and only accessible to select Diamond Power employees who were issued additional passwords—the Hardware Book file was available on Diamond Power's P-Drive and thus accessible to any of the many Diamond

---

[3]    Defendants note that HCC fails to present any evidence that the Acceptable Use Policy was ever issued to or received by Remeika or Flowers.

Power employees who had computer access.  Furthermore, the
Hardware Book file was not marked confidential, and Diamond Power
did not promulgate any specific policy to restrict or track the use of
the Hardware Book file by employees.  Nor did Diamond Power
prevent its employees, such as Davidson, from transferring the
Hardware Book file to a compact or portable disk or to their home
computers.  It was thus possible for any Diamond Power employee to
retain the Hardware File on a personal computer for an indefinite
period of time during their employment.

Diamond Power, 540 F. Supp. 2d at 1334-35.  The Court found that requiring

employees to sign a general confidentiality agreement does not alone demonstrate

that efforts to maintain secrecy were reasonable.  Id. at 1335 (citing Equifax Servs.,

Inc. v. Examination Mgmt. Servs., Inc., 453 S.E.2d 488, 493 (Ga. Ct. App. 1994)).

The Court concluded that Diamond Power's efforts to maintain the secrecy of the

Hardware Book file were not reasonable as a matter of law.

As in Diamond Power, HCC does not present any evidence that it:

(1) labeled the Hot Sheets confidential or otherwise communicated the

confidentiality of the Hot Sheets directly to its employees; (2) directed its

employees to maintain the secrecy of the file other than through a general

confidentiality agreement that did not expressly mention the Hot Sheets; or

(3) tracked the use of Hot Sheets.  The Court finds that HCC did not, as a matter of

law, take reasonable efforts to maintain the security of the Hot Sheets.  HCC thus

cannot establish that its Hot Sheets are entitled to protection as trade secrets under

the GTSA.  Accordingly, Defendants' Motion for Summary Judgment is granted

on HCC's GTSA claim.

> b)      Whether the Hot Sheets were Misappropriated

Even if HCC could show the Hot Sheets are trade secrets, HCC also fails to

present evidence to show the Hot Sheets were misappropriated.

"Misappropriation" means:

> (A) Acquisition of a trade secret of another by a person who knows or
> has reason to know that the trade secret was acquired by improper
> means; or
>
> (B) Disclosure or use of a trade secret of another without express or
> implied consent by a person who:
>
> > (i) Used improper means to acquire knowledge of a trade secret;
> >
> > (ii) At the time of disclosure or use, knew or had reason to
> > know that knowledge of the trade secret was:
> >
> > > (I) Derived from or through a person who had utilized
> > > improper means to acquire it;
> > >
> > > (II) Acquired under circumstances giving rise to a duty to
> > > maintain its secrecy or limit its use; or
> > >
> > > (III) Derived from or through a person who owed a duty
> > > to the person seeking relief to maintain its secrecy or
> > > limit its use; or
> >
> > (iii) Before a material change of position, knew or had reason to
> > know that it was a trade secret and that knowledge of it had
> > been acquired by accident or mistake.

17

O.C.G.A. § 10-1-761.  For purposes of subsection (A), the statute defines

"improper means" as "theft, bribery, misrepresentation, breach or inducement of a

breach of a confidential relationship or other duty to maintain secrecy or limit use,

or espionage through electronic or other means."  O.C.G.A. § 10-1-761(1).

"Acquisition," "disclosure," or "use" of a trade secret is a question of fact.

Diamond Power, 540 F. Supp. 2d at 1292 n.6 (citing Outside Carpets, Inc. v. Indus.

Rug Co., 185 S.E.2d 65, 68 (Ga. 1971)).

    With respect to subsection (A)—whether Defendants improperly acquired

trade secrets—as described in further detail in the Court's January 30, 2017, order,

HCC presents only speculative circumstantial evidence that Flowers actually

transferred any HCC documents to her personal computer.  To support that a

defendant misappropriated a trade secret, a plaintiff may use circumstantial

evidence.  See Tronitec, Inc. v. Shealy, 547 S.E.2d 749, 758 (Ga. Ct. App. 2001),

overruled on other grounds by Williams Gen. Corp. v. Stone, 614 S.E.2d 758 (Ga.

2005).  "In ruling on a motion for summary judgment, a finding of fact that may be

inferred from, but is not demanded by, circumstantial evidence has no probative

value against positive and uncontradicted evidence that no such fact exists,

provided that the circumstantial evidence may be construed consistently with the

direct evidence."  White v. Shamrock Bldg. Sys., Inc., 669 S.E.2d 168, 173 (Ga.

Ct. App. 2008) (quoting First Citizens Bank of Clayton Cty. v. All-Lift of Ga., Inc., 555 S.E.2d 1, 3 (Ga. Ct. App. 2001)); see also Contract Furniture Refinishing & Maint. Corp. of Ga. v. Remanufacturing & Design Grp., LLC, 730 S.E.2d 708, 714 (Ga. Ct. App. 2012) ("[W]hile [the plaintiff] has produced strong circumstantial evidence that [the defendant] may have used or disclosed its alleged trade secrets, this evidence is also consistent with the direct evidence that [the defendant] did not in fact do so."). In other words, to create a triable issue in the face of direct evidence that the defendant did not use or disclose trade secrets, a plaintiff must present circumstantial evidence that demands an inference that trade secrets were used or disclosed. Our Circuit adopts the same analytical approach. See Purchasing Power, LLC v. Bluestem Brands, Inc., 22 F. Supp. 3d 1305, 1316 (N.D. Ga. 2014), vacated on other grounds (Feb. 2, 2015) (citing Penalty Kick Mgmt. Ltd. V. Coca Cola Co., 318 F.3d 1284, 1296 (11th Cir. 2003)). Allowing circumstantial evidence of acquisition or use of a trade secret to defeat direct evidence of non-acquisition or use offered by the defendant would operate to shift to the defendant the burden to prove it did not acquire or use the trade secrets. See id. (citing Penalty Kick, 318 F.3d at 1296). Such a burden shift is improper. It always is the plaintiff's burden to prove its claims, and if the circumstantial evidence is consistent with the defendant's direct evidence—that is, if it does not

contradict the direct evidence—there is no dispute of fact sufficient to deny the defendant a grant of summary judgment. Id. (citing Penalty Kick, 318 F.3d at 1296).

Defendants present direct evidence, including the deposition testimony of Flowers and Mr. Flowers, that Defendants did not transfer any HCC documents to Flowers' personal computer.  As discussed in further detail in the Court's January 30, 2017, order, this evidence is supported by the forensic examinations of the computer conducted by HCC, Defendants, and the Neutral that did not show the presence of any HCC documents or data on Flowers' computer.  While HCC presents circumstantial evidence that Flowers or Mr. Flowers may have transferred documents to Flowers' home computer, the inference that a transfer occurred is not "demanded by" the circumstantial evidence.  See White, 669 S.E.2d at 173. HCC's circumstantial evidence of "suspicious" activities is consistent with Flowers' direct evidence that she did not transfer any documents from HCC to her personal computer.  The Court finds HCC fails to present evidence sufficient to create an issue of material fact as to whether Defendants acquired HCC's trade secrets by improper means.[4]

---

[4]     Even if HCC could show Flowers transferred Hot Sheets to her personal computer, HCC's underwriters are authorized to access Hot Sheets remotely on

Turning to subsection (B)—whether Defendants disclosed or used any of HCC's trade secrets—HCC also presents only circumstantial evidence.  HCC relies upon the following circumstantial evidence to show that Defendants disclosed or used HCC's trade secrets:

1.   CRU was formed from the ground up in approximately two months, and "stole" its first account from HCC one month after Remeika and Flowers resigned.

2.   Within the first five months of CRU's existence, CRU "stole" 17 former HCC Life accounts.

3.   A July 2015 CRU strategy document stated that CRU's strategy was to "cherry-pick" accounts from HCC.

Defendants present the following direct and circumstantial evidence to show they did not use or disclose HCC's trade secrets:

---

their personal computers to the extent authorized and necessary to fulfill their assigned job duties.  (See Strusz Dep. [87.11] 131:2-8; Luebke Decl. [94.6] ¶ 5).  HCC does not appear to contend that a transfer occurred after Flowers terminated her employment and it does not otherwise present evidence that Flowers was not authorized to transfer Hot Sheets when she allegedly did.  See Chemence Med. Prods., Inc. v. Quinn, 1:11-cv-1366-CAP, 2015 WL 12532179, at *6 (N.D. Ga. Aug. 5, 2015) (denying summary judgment where defendant allegedly misappropriated emails after defendant terminated his relationship with plaintiffs); Putters v. Rmax Operating, LLC, No. 1:13-cv-3382-TWT, 2014 WL 1466902 (N.D. Ga. Apr. 15, 2014) (employee did not acquire trade secrets using improper means because he did not gain knowledge of any new trade secrets following his resignation).

1.    Flowers, Remeika, and Mr. Flowers testified at their depositions that they did not misappropriate any trade secrets.  Remeika testified that he acquired business from HCC's former clients, which he knew from his work at HCC, based on the strength of CRU's proposals and because the clients were unhappy with HCC's claims handling.

2.    Daniel Strusz, HCC Life's CEO, testified that he could not explain how any former HCC customers were stolen by CRU and that he did not know what trade secrets or confidential information were allegedly stolen (see Strusz Dep. [93.14] at 93:3-95:1).

3.    Marilynn E. Schafer, founder of Lifewell Health Plans, stated that she had a longstanding working relationship with Remeika and found him to be knowledgeable, trustworthy, and extremely responsive.  She stated that she recommended to her client, MedSide Corporation, that it obtain medical stop loss coverage through CRU rather than HCC based upon CRU's proposal, the reputation of its carrier, and her high regard for Remeika and his expertise in medical stop loss issues.  She stated that neither Remeika nor any other CRU employee mentioned to her anything regarding HCC Life's tier rating for MedSide. (Schafer Decl. [87.6]).

4.    J. Wayne Kempton, CEO of the Kempton Group Administrators ("KGA"), stated that he had a longstanding working relationship with Remeika.  He stated that, when he learned Remeika started CRU, he asked to send requests for proposals to CRU to provide medical stop loss coverage to the employer groups whose plans KGA administered. He made the request based on his concerns regarding HCC Life's business and his prior working relationship with Mr. Remeika. (Kempton Decl. [87.5]).

The Court finds that, while HCC presents some circumstantial evidence that Defendants may have used or disclosed its alleged trade secrets to acquire customers from HCC, the evidence is also consistent with Defendants' unequivocal direct evidence, including from customers acquired, that Defendants did not use

HCC trade secret information to do so.  Defendants' testimony is supported by

evidence showing that HCC's former clients decided to do business with CRU

based upon their longstanding working relationships with Remeika.  The type of

evidence HCC presents is the same type of evidence one would expect whenever a

former employee starts a competing company.  Particularly where, as here, former

employees have expertise and relationships with clients, some clients are bound to

move their business to the competing company.  That CRU, a company formed to

compete with HCC, had a strategy to "cherry-pick" HCC's clients, is not surprising

or inherently suspect.  In short, HCC's circumstantial evidence, in the face of

direct evidence that Defendants did not use HCC's trade secrets, does not create a

genuine issue of material fact whether Defendants used HCC's trade secrets.  See

Contract Furniture, 730 S.E.2d at 714-15; see also Wachovia Ins. Servs. v. Fallon,

682 S.E.2d 657 (Ga. Ct. App. 2009) (former employee entitled to summary

judgment on misappropriation of trade secrets claims where record contained no

evidence showing that former employee used alleged trade secrets in his

subsequent competing business); Stargate Software Int'l v. Rumph, 482 S.E.2d 498

(Ga. Ct. App. 1997) (affirming grant of summary judgment because record

contained no evidence that defendant "actually provided source code to [plaintiff's

client] or any other person"); cf. Hilb, 644 S.E.2d 862 (finding issue of fact

regarding misappropriation because former employee admitted using trade secret information after his resignation); <u>DeGiorgio v. Megabyte Int'l</u>, 468 S.E.2d 367 (Ga. 1996) (finding issues of fact on misappropriation where employer received complaints from top customers, who could not be identified through phone books or commercial lists, about former employee's activities).

Even if HCC could establish that the Hot Sheets are trade secrets, Defendants are entitled to summary judgment on HCC's GTSA claim.

### 2.  Breach of Contract

HCC claims Flowers breached the Business Confidentiality Policy that she signed on April 24, 2007, by "using and disclosing HCC's confidential information."  (RSAC ¶¶ 71-73).[5]  The Court already has found HCC failed to present evidence to create a triable issue whether Flowers used or disclosed the Hot Sheets, and HCC's breach of contract claim also fails.

Even if HCC showed that Flowers used or disclosed the Hot Sheets in violation of the Policy, the nondisclosure obligation is unenforceable under

---

[5]    The Policy prohibits employees from discussing or disclosing "Confidential Information" to anyone outside the company, or using the information to benefit anyone or any entity besides HCC.  ([93.5] at 20).  The Policy defines "Confidential Information" to include "all information relating to [HCC] or its operations which is not generally known to people that are not employees of, or otherwise associated with, [HCC] whether or not designated as confidential."  (Id.).

Georgia law.  Georgia is one of the very few states that has a public policy that has

historically disfavored restrictive covenants.[6]  See generally, Carson v. Obor

Holding Co., LLC, 734 S.E.2d 477 (Ga. Ct. App. 2012).  Georgia Courts have held

that nondisclosure agreements containing restrictions exceeding two years

following a contract's termination are generally unreasonable and unenforceable

when information that is not a trade secret is at issue.  See Pregler v. C & Z, Inc.,

575 S.E.2d 915 (Ga. Ct. App. 2003) ("A nondisclosure clause with no time limit is

unenforceable as to information that is not a trade secret."); Cox v. Altus

Healthcare and Hospice, Inc., 706 S.E.2d 660, 664 (Ga. Ct. App. 2011)

("[N]ondisclosure provisions in the form and the agreement are unenforceable on

their face because they are not limited in time.").

    The Policy does not contain a time limit, and thus is unenforceable as to

information that is not a trade secret.  See id.  Having found that the Hot Sheets are

---

[6]    In November 2010, Georgia voters approved a constitutional amendment
that substantially altered Georgia's public policy on restrictive covenants.  As a
result of the constitutional amendment, Georgia enacted new statutory provisions
governing restrictive covenants in employment contracts.  See O.C.G.A. § 13-8-50,
et seq.  Georgia law provides that the new law "shall not apply in actions
determining the enforceability of restrictive covenants entered into before" the
ratification of the constitutional amendment.  Carson v. Obor Holding Co., LLC,
734 S.E.2d 477, 480 n.1 (Ga. Ct. App. 2012).  For pre-ratification contracts,
Georgia courts will "apply the law of restrictive covenants as it existed before
[ratification]."  Id. (citation omitted).  The Policy, signed in 2007, is a
pre-ratification contract.

not trade secrets because HCC failed to use reasonable efforts to maintain their secrecy, Defendants are entitled to summary judgment on HCC's breach of contract claim.

### 3.   Tortious Interference with Contract

HCC claims CRU and Remeika interfered with the contractual obligations Flowers owed to HCC by causing Flowers to misappropriate HCC's confidential and trade secret information.  (RSAC ¶ 76).  To prevail on a claim of tortious interference with contractual relations under Georgia law, HCC must show that CRU and Remeika:

> (1) acted improperly and without privilege, (2) purposely and with malice with the intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with [HCC], and (4) for which [HCC] suffered some financial injury.

Fine v. Commc'n Trends, Inc., 699 S.E.2d 623, 633 (Ga. Ct. App. 2010) (citation omitted).  "A cause of action for intentional interference with contractual rights must be based on the intentional and non-privileged interference by a third party with existing contractual rights and relations."  Id.

The Court has determined that HCC failed to present evidence to create a triable issue whether Defendants misappropriated any confidential information, and HCC's tortious interference with contract claim fails.  Because the nondisclosure provision is void, as explained above, the Court further finds that

CRU and Remeika cannot be held liable for interfering with its enforcement.  Id. (citing Wachovia Ins. Svcs. v. Fallon, 682 S.E.2d 657 (Ga. Ct. App. 2009)).

Even if HCC could overcome these hurdles, HCC fails to present any evidence to show that Remeika or CRU encouraged Flowers to take HCC's confidential information.  HCC points to evidence that Remeika and Flowers took steps in connection with the business of CRU while both were employed with HCC, that the information in the Hot Sheets was valuable to Remeika, and that, prior to their resignation from HCC, no producers of HCC business agreed to provide HCC account information to Defendants.  HCC claims that this evidence raises a fact issue whether Remeika directed Flowers to steal the Hot Sheets.  The Court finds HCC provides nothing more than rank speculation to support its claim that Remeika directed or encouraged Flowers to steal any information.  Summary judgment is appropriate to be granted on HCC's tortious interference with contract claim.

### 4. CFAA Claim

The CFAA, 18 U.S.C. § 1030, prohibits accessing a computer and obtaining information without authorization or by exceeding authorized access.  Section 1030(a)(2)(C) provides:

> [Whoever] intentionally *accesses* a computer *without authorization* or *exceeds authorized access* and thereby obtains . . . information from

any protected computer if the conduct involved an interstate or foreign communication . . . shall be punished.

18 U.S.C. § 1030(a)(2)(C) (emphasis added).

Section 1030(a)(4) provides:

> [Whoever] knowingly and with intent to defraud, *accesses* a protected computer *without authorization,* or *exceeds authorized access,* and by means of such conduct furthers the intended fraud and obtains anything of value . . . shall be punished.

18 U.S.C. § 1030(a)(4) (emphasis added).

Although principally a criminal statute, the CFAA provides that "any person who suffers damage or loss [as a result of a violation] . . . may maintain a civil action . . . for compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g). The CFAA does not define "without authorization." District courts in this Circuit have held that a violation under the CFAA for access "without authorization" "occurs only where initial access is not permitted." EarthCam, 49 F. Supp. 3d at 1231 (citing Diamond Power, 540 F.Supp.2d at 1341 (N.D. Ga. 2007); Lockheed Martin Corp. v. Speed, No. 6:05-cv-1580–ORL–31, 2006 WL 2683058 (M.D. Fla. Aug.1, 2006)). The CFAA defines "exceeds authorized access" to mean "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6).

HCC contends Flowers accessed the Hot Sheets using her HCC computer "in order to misappropriate those documents for use in connection with CRU's business." ([93]). It argues that, "while Flowers was authorized to access her HCC computer and HCC's computer systems, she exceeded such authorization when she transferred trade secrets in violation of HCC's policies and her duty of loyalty." (Id.). The Court has found that HCC fails to present evidence to create a triable issue whether Flowers transferred, disclosed, or used any Hot Sheets. To the extent HCC contends Flowers violated the CFAA by transferring emails or Hot Sheets between different drives on her HCC computer, the claim fails. Though HCC contends that it was not part of Flowers' job duties to update *all* of HCC's Hot Sheets, it is uncontested that Flowers was authorized to access the Hot Sheets, that it was part of her job duties to review and update Hot Sheets, and that Flowers had Hot Sheet folders in the C: Drive of her HCC computer.

Defendants also argue that HCC's CFAA claim fails because HCC did not present any evidence of damages it suffered as a result of any of Flowers' alleged actions.[7] The CFAA provides: "Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief."

---

[7] HCC failed to respond to this argument.

18 U.S.C. § 1030(g).  The term "damage" means "any impairment to the integrity or availability of data, a program, a system, or information." Id. § 1030(e)(8).  The term "loss" means "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."  Id. § 1030(e)(11).  Courts in our Circuit have held that lost revenue from misappropriated trade secrets is not a "damage" or "loss" compensable under the CFAA, and a claim based solely on such damage or loss fails as a matter of law.  IPC Sys., Inc. v. Garrigan, No. 1:11-CV-3910-AT, 2012 WL 12872028, at *7 (N.D. Ga. May 21, 2012) (citing Andritz v. S. Maint. Contractor, LLC, 626 F. Supp. 2d 1264 (M.D. Ga. 2009); Volk v. Zeanah, No. 608cv094, 2010 WL 318261 (S.D. Ga. Jan. 25, 2010)).

　　HCC does not present any evidence that it suffered damages compensable under the CFAA as a result of Flowers' alleged conduct.  HCC does not present evidence that there was any impairment to its computer system or data as a result of Flowers' alleged conduct, including because, after the alleged misappropriation, HCC still had access to the Hot Sheets.  HCC also does not present evidence that it suffered any damages related to responding to Flowers' conduct or conducting a

damage assessment,[8] nor does HCC present evidence that it lost revenue or incurred costs because of an interruption in service.  HCC instead contends it lost revenue because Defendants used the Hot Sheets to steal customers away from HCC.  "While a remedy may exist for such conduct, Congress did not provide one in [the] CFAA."  <u>Andritz</u>, 626 F. Supp. 2d at 1267.  Defendants' Motion for Summary Judgment is granted on HCC's CFAA claim.

5.   <u>Breach of Fiduciary Duty</u>

Finally, HCC claims Remeika breached his fiduciary duty to Plaintiff by soliciting and inducing Flowers to resign her employment with HCC Life to work for CRU while they were both still employed by HCC Life.  (RSAC ¶ 87).  "It is well established that a claim for breach of fiduciary duty requires proof of three elements:  (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach."  <u>Griffin v. Fowler</u>, 579 S.E.2d 848, 850 (Ga. Ct. App. 2003).

---

[8]      In its RSAC, HCC alleges that it "has suffered losses and damages . . . including but not limited to costs incurred in connection with this lawsuit to determine the loss of HCC data as well as the costs and expenses incurred in attempting to recover the data."  (RSAC ¶ 85).  On a motion for summary judgment, the nonmoving party may not merely rest on its pleadings. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986).

Fiduciary duties and obligations are owed by those in confidential relationships, that is, relationships "where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc." Atlanta Market Ctr. Mgmt., Co. v McLane, 503 S.E.2d 278, 281 (Ga. 1998) (quoting O.C.G.A. § 23-2-58). An agency relationship arises "wherever one person, expressly or by implication, authorizes another to act for him . . . ." Id. (quoting O.C.G.A. § 10-6-1). To serve as an agent, an employee must be "vested with authority, real or ostensible, to create obligations on behalf of [the employer] . . . ." Id. (quoting Se. Fidelity Ins. Co. v. Heard, 182 S.E.2d 153 (Ga. 1971)). Corporate officers and directors occupy a fiduciary relationship to the corporation and its shareholders, and are held to the standard of utmost good faith and loyalty. Hilb, 670 S.E.2d at 877.

While the evidence shows Remeika had the title of "Regional Vice-President of Sales," ([87.2] ¶ 3), HCC does not provide evidence to support that Remeika is, in fact, a corporate officer or that he had the authority to bind his employer with respect to any matters. See Instrument Repair Serv., Inc. v. Gunby, 518 S.E.2d 161, 163 (Ga. Ct. App. 1999) ("Defendant . . . was given a title but was not a

director or an elected corporate officer of [the plaintiff.]").  Without evidence of

Remeika's job responsibilities, it is unclear whether the breach of fiduciary duty

alleged here concerned a matter over which he had authority to bind the company.

See Gordon Doc. Prods., Inc. v. Serv. Techs., Inc., 708 S.E.2d 48, 56 (Ga. Ct. App.

2011) ("the breach of fiduciary duty alleged here concerned [defendant's] alleged

solicitation of his co-workers . . . , and there is no evidence he had the authority to

bind the company on employment matters or relations."); Atlanta Market, 503

S.E.2d at 281-82 ("The employee-employer relationship is not one from which the

law will necessarily imply fiduciary obligations; however, the facts of a particular

case may establish the existence of a confidential relationship between an

employer and an employee concerning a particular transaction . . . .").

Assuming that Remeika was a corporate officer or that he otherwise had the

authority to bind HCC Life on employment matters, HCC fails to present sufficient

evidence to show that he breached his duty by "inducing" or "soliciting" Flowers

to leave her employment with HCC Life.  "A corporate officer does not breach

fiduciary duties owed to the corporation simply by making plans to start a

competing company while still employed by the corporation."  Gresham &

Assocs., Inc. v. Strianese, 595 S.E.2d 82, 84 (Ga. Ct. App. 2004).  "But during the

term of employment with the corporation, the officer may not solicit customers for

a competing company or otherwise engage in direct competition with the

corporation's business." Id. at 85.

HCC relies on U.S. Anchor Mfg., Inc. v. Rule Indus., Inc., 717 F. Supp.

1565, 1576 (N.D. Ga. 1989) to support its argument that a corporate officer

breaches his fiduciary duty when, while still employed, he solicits the employer's

sales representatives to work for a rival business.  In U.S. Anchor, the Court relied

on E.D. Lacey Mills, Inc. v. Keith, 359 S.E.2d 148 (Ga. Ct. App. 1987) in finding

that the "fiduciary duty is . . . violated by making numerous arrangements for the

competing business while still employed and by soliciting the employers'

customers and sales representatives for the rival business." U.S. Anchor, 717 F.

Supp. At 1576.  In Keith, the Georgia Court of Appeals found that the trial court

properly denied the defendants' motion for summary judgment on the plaintiff's

breach of fiduciary duty claim where the evidence showed that the defendants,

while still employed with the plaintiff:  conducted numerous meetings and

telephone calls in pursuit of their plans to start a competing business; made

numerous contacts with the trustee in bankruptcy for facilities owned by the

plaintiff; paid money to the trustee in bankruptcy for an option to purchase the

facilities; retained an attorney to draft articles of incorporation for a new company;

broached the subject of their plans to go into business in competition with the

plaintiff to certain of the plaintiff's sales representatives in the months prior to their departure; and one defendant was frequently absent from the office prior to his departure; defendants. Keith, 359 S.E.2d at 358, 364. The court concluded that this evidence was sufficient to create a question for the jury as to whether defendants breached their fiduciary duties to the plaintiff. See id. at 364.

In Gresham & Assocs., Inc. v. Strianese, 595 S.E.2d 82 (Ga. Ct. App. 2004), the defendant collaborated with Brown & Brown, a competitor of the plaintiff's, to form a third competing company. The Georgia Court of Appeals found a triable issue regarding breach of fiduciary duty where the defendant, while still employed with the plaintiff: revealed his plans to start a competing company to three of the plaintiff's at-will employees who then resigned and went to work for the defendant's competing company; met with department employees, discussed the planned competing company, and named two of the employees as potential employees of the new company in a written proposal to Brown & Brown; made offers to employees to leave the plaintiff and take positions with his planned new company; arranged for Brown & Brown to loan money to one employee to enable the employee to repay a 401(k) loan she had with the plaintiff; and advised another employee on compensation package negotiations. The court noted that, while there was evidence that two of the employees left the plaintiff because they were

dissatisfied with their employment, the other evidence created a factual issue whether the defendant "solicited or induced these employees to leave in violation of his fiduciary duties, or whether they left for wholly unrelated reasons." Id. at 85.

HCC relies on the testimony of Remeika and Flowers to show the Remeika "induced" or "solicited" Flowers to leave her employment. Remeika testified that Flowers told him "she was thinking of becoming an Uber driver" and that she "express[ed] that she was unhappy" with her employment at HCC. (Remeika Dep. [93.3] at 30:13-18). During that same conversation, he told Flowers he was thinking of starting his own company, and that Flowers said she would like to join him if he did. (Id. at 30:19-31:24). Though Remeika also stated that the two of them "talked about being partners[,]" (Id. at 32:19), the context of Remeika's testimony is clear that Flowers initiated the idea of joining Remeika. Flowers testified that she told Remeika she was dissatisfied with her job at HCC. (Flowers Dep. [87.7] at 36:6-37:23). She told him that she "wanted to drive for Uber or somebody like that. I was ready to quit." (Id. at 38:6-7). Remeika "told [her] he was thinking about doing something else and would I want to be a partner. We were thinking about being partners. But we had—I had talked about leaving [HCC Life] for—on and off for a couple of years." (Id. at 38:11-16). Flowers testified

36

that, prior to the conversation, she had sent out résumés, and had a résumé posted on Career Builder for "forever." (Id. at 38:19-23). On August 3, 2015, a few weeks before the two resigned, Remeika and Flowers set up CRU. Afterwards, the two researched, "on [their] own time," the viability of starting CRU (Remeika Decl. [87.4] ¶ 2). Their activities included creating a business plan, discussing potential vendors, estimating operating expenses, answering questionnaires needed to obtain approval from carriers to use their paper for CRU, creating a list of CRU's needs, and setting up a domain name. (See [93.2] ¶¶ 32-39). On August 21, 2016, Flowers and Remeika resigned.[9]

These facts are substantially different than those in Keith and Gresham. First, the evidence shows that Flowers was unhappy with her employment with HCC, and that she initiated a conversation with Remeika during which she told him that she wanted to leave the company. See Gresham, 595 S.E.2d at 85 (noting that evidence showed two of the "solicited" employees left because they were dissatisfied with the company); cf. Gordon Document Prod., Inc. v. Serv. Techs., Inc., 708 S.E.2d 48, 54 (Ga. Ct. App. 2011) (upholding grant of summary judgment on tortious interference with employee and business relations claims

_____

[9]     Remeika resigned the same day, and, on August 25, 2015, declined HCC Life's request that he reconsider his resignation. (Remeika Dep. 32:22-33:2).

where "it appear[ed] that there was prevalent employee dissatisfaction at [the company] and that [the defendant] reaching out and procuring employment with this former boss merely provided the opportunity that others had already been seeking").  Unlike in Gresham, HCC does not provide any evidence that Remeika used his position to provide financial incentives or other help to induce Flowers to leave her employment.  Unlike in either Keith or Gresham, there is no evidence to support that Remeika or Flowers reached out to or solicited competitors while employed with HCC, that either was absent from work or was spending workdays or work resources to set up CRU, or that either engaged in any sort of direct competition with HCC during their employment.  See Continental Maritime Servs., Inc. v. Maritime Bureau, Inc., 621 S.E.2d 775, 777-78 (Ga. Ct. App. 2005) (summary judgment warranted where no evidence that defendant solicited any customers or otherwise took action in direct competition with employer while working for the employer).  Further, neither Keith nor Gresham support that a fiduciary duty is breached based solely on evidence that a fiduciary suggested an employee work for a competing company.  In short, the evidence shows Flowers sought to leave her job at HCC Life, that she initiated a conversation with Remeika about leaving HCC Life, and that Remeika merely provided an opportunity.  Under

these circumstances, Remeika did not "solicit" or "induce" Flowers to leave her

job, and the Court finds Remeika did not breach his fiduciary duty to HCC.[10]

Accordingly, Defendants' Motion for Summary Judgment is granted on

HCC's breach of fiduciary duty claim.  Because Defendants are entitled to

summary judgment on all of HCC's substantive claims, Defendants are also

entitled to summary judgment on HCC's claims for attorneys' fees and costs and

exemplary damages.  See Armstead v. McFarland, 650 S.E.2d 737 (Ga. Ct. App.

2007) (attorneys' fees not available where general damages not awarded).[11, 12]

---

[10]     Even if HCC showed that Remeika owed a fiduciary duty to HCC Life and
that he breached that duty by soliciting or inducing Flowers to leave her job, HCC
fails to present any evidence that it suffered damages as a result of Remeika's
alleged inducement of Flowers.  Proof of damages is an essential element to a
claim for breach of a fiduciary duty, and a failure to prove damages is fatal to a
plaintiff's claim.  Niloy & Rohan, LLC v. Sechler, 782 S.E.2d 293, 296-97 (Ga. Ct.
App. 2016).  A plaintiff must show that the defendant's breach of its duty
proximately caused the plaintiff's damages.  See Griffin v. Flower, 579 S.E.2d
848, 850 (Ga. Ct. App. 2003).  It is unclear what damages HCC claims were
proximately caused by Remeika's alleged solicitation of Flowers.  The evidence
shows that Flowers sought to leave HCC Life before she was allegedly solicited by
Remeika.

[11]     HCC also includes in its RSAC a request for a preliminary injunction.
Because HCC's claims fail on the merits, HCC's request is denied.

[12]     Because several of the documents the parties submitted in support of their
briefs on Defendants' Motion for Summary Judgment contain confidential and
sensitive information, the parties filed their motions for leave to file matters under
seal [95], [106], [111].  Having reviewed the contents of the documents the parties
seek to seal, the Court finds they contain confidential and sensitive information,
and the Court grants the parties' motions.

III.    CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants Valda Flowers, Creative Risk

Underwriters, LLC, and Michael Remeika's Motion for Summary Judgment [87] is

**GRANTED**.

**IT IS FURTHER ORDERED** that the parties' motions for leave to file

matters under seal [95], [106], [111] are **GRANTED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED WITH**

**PREJUDICE**.

**SO ORDERED** this 22nd day of February, 2017.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE